UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| FAIRMONT HOMES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 3:09-CV-323 CAN |
| ) | |
| BLUELINX CORPORATION, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

**I.     INTRODUCTION**

The Plaintiff, Fairmont Homes, Inc. ("Fairmont"), manufactures modular homes and sells them throughout the United States. In 2006, Fairmont began receiving complaints from its customers that the floors of the modular homes were uneven or wavy. It states the obvious that wavy or warped floor panels in modular homes are unacceptable to both the consumer and the manufacturer. Fairmont alleges that Huber Engineered Woods, LLC ("Huber"), the manufacturer of the floor panels, is legally responsible for the warped or wavy floor panels. Specifically, Fairmont alleges that Huber violated Indiana's implied warranty of merchantability, Indiana Code §26-1-2-314(1). Huber responds that it is not liable for the defective floors because Fairmont has failed to prove that Huber breached its warranty of merchantability. Specifically, Huber contends that Fairmont has not adequately shown that Huber's jumbo floor panels were defective or caused the wavy or warped modular home floors. For the reasons that follow, this Court concludes that Huber is legally responsible for the wavy or warped floor panels.

**II.     PROCEDURE**

Because Fairmont had raised a genuine issue of material fact regarding whether Huber's

jumbo panels were in fact responsible for the warped floors, the case proceeded to a three day bench trial on July 26, 2011. At the conclusion of the bench trial, the Court allowed the parties to submit post-trial briefs on all the issues raised during the trial. And on September 15, 2011, the Court held oral arguments on the trial briefs. The Court now renders the following opinion and judgment based upon the consent of the parties and 28 U.S.C. §636(c).

## III. FINDINGS OF FACT

The following facts are largely uncontested and are mostly taken either from the parties' briefs or from testimony and evidence submitted at the bench trial. As to any formally-disputed facts which are also included in this Court's summary, this Court as finder-of-fact has concluded those facts to have been established by the testimony and evidence presented at the bench trial.

Fairmont is a modular home manufacturer located in Indiana. Huber is a Delaware limited liability company that manufactures engineered wood products, including jumbo wood floor panels. Defendant, Bluelinx Corporation ("Bluelinx"), is a Georgia corporation that sold Huber wood products. Defendant, Universal Forest Products, Inc. ("UFP"), is a Michigan corporations that also sold Huber wood products. Fairmont is seeking in excess of $800,000 for damages resulting from uneven floors that utilized Huber jumbo panels.

### A. Fairmont purchases and installs Huber's AdvanTech panels.

Huber began manufacturing jumbo wood panels in 2005. Doc. No. 103-1 at 1. The jumbo panels are oriented strand board ("OSB") panels made of wood flakes and resin and measure eight feet by sixteen feet, making them four times larger than most OSB panels. The wood flakes are pressed into sheets held together by the resin, and then the sheets are pressed together in different orientations to form a panel. Tr. 400-02. Huber used a special resin, rather than the industry standard resin. Tr. 430. Huber marketed its jumbo panels to the modular home industry

2

as subflooring panels. *Id.* at 1-2; Tr. 645. Huber's distributors, Bluelinx and UFP, marketed the jumbo panels as a premium product that was moisture resistant. Tr. 80. Bluelinx also stated that it was a "high-performance" panel and was "dimensionally stable." Tr. 38, 43-44, 62, 76-77, 645. Bluelinx stated that it lay as "flat as a pancake." Tr. 73, 80.

Fairmont had been using another jumbo panel, called Hambro, in the construction of its modular homes, but in 2005, Fairmont began to experience warping in the Hambro panels, so it decided to replace Hambro with a more stable panel. Tr. 111-12. In August 2005, Fairmont began purchasing Huber jumbo panels for use as subfloors in the construction of its modular homes. Doc. No. 90 at 2.

Fairmont began installing Huber's jumbo panels in its modular homes without any gaps between the panels, a common practice in the modular home industry. Tr. 116, 137-38. Fairmont did not modify the panels in any way before installing them into their floor system. Between August 2005 and September 2006, Fairmont built at least ninety of the 236 homes without gaps between the floor panels. Tr. 260-61; Def. Ex. KKKK. Fairmont installed the panels in this way because it was the easiest way to ensure that the home's floor frame was square. Tr. 107-08, 115. Fairmont's manufacturing processes were reviewed and approved by an outside engineering firm, known as RADCO. Tr. 129. Fairmont built a total of 1,026 homes using Huber's jumbo panels. Tr. 157.

In January 2006, Fairmont began receiving complaints from its customers that the floors of their modular homes were uneven. Tr. 208. Initially, Fairmont did not employ a gap between the floor panels, but after many complaints about uneven floors and consulting with Huber, Fairmont began to employ a 1/8 inch gap between the panels. Tr. 120. However, the complaints continued, and Fairmont expanded the gap even further. *Id.* Wavy floors occurred under several

3

circumstances, including in homes that had open-web trusses and in homes that had I-joists, in homes with strong backs, and those without. Tr. 94-96, 632. Wavy floors occurred in homes with crawl spaces and those with foundations. Tr. 192-93. Wavy floors occurred in homes in eleven different states with varying climates. Tr. 129-30. Wavy floors occurred regardless of which of the sixty-five dealers sold and delivered the modular home. Tr. 213. Despite this variety of circumstances, the one common factor present in all affected homes was the use of Huber's jumbo panels.

Also, in an effort to correct the uneven floors, Fairmont developed a repair protocol that included kerf[1] cutting the jumbo panels, after which the panels would relax, adjust and flatten. Tr. 209. The protocol also included installing strong backs[2] to correct weak, crooked, or out-of-plumb joists within the floor system. Tr. 177. Fairmont was able to correct all of the uneven floors by employing the use of kerf cuts, strong backs, or a combination of the two. Plf. Ex. 2. However, fifty-two such homes did not receive any kerf cuts after wavy floors were reported because kerf cuts had been made in the manufacturing process before shipping the home. Tr. 176. In all but eight of the homes that received kerf cuts strong backs were also installed. *Id.* Although a variety of problems existed in many of the 236 homes including excessive moisture in crawl spaces, broken or crooked joists, and cut trusses, Fairmont attributed the waviness in the floors to excessive linear expansion of Huber's jumbo panels. Tr. 348-51.

Fairmont asked Huber to inspect six of the homes that experienced wavy floors. Tr. 289, 352. During the inspection of these six homes, Huber's inspector noticed broken and cut trusses

---

[1] A kerf cut is a saw-blade width cut in a panel for the purposes of creating a relief gap in the wood. Tr. 182.

[2] A strong back is a board that is attached to two or more joists in such a way that neighboring joists provide support to a load-bearing joist. Tr. 139.

in several different locations and that some joists were almost an inch out of plumb. Tr. 291-92. Huber also measured the width of the panels with a tape measure and concluded that they had not expanded excessively. Tr. 628-30. For these reasons, Huber did not accept Fairmont's warranty claims for the wavy floor repairs.

Fairmont was not alone in experiencing problems with Huber's jumbo panels. Another modular home manufacturer, Commodore Homes, also experienced wavy floors. Commodore also employed kerf cuts to remedy the problem. Tr. 219.

### B. Dr. Via tested jumbo panels for excessive linear expansion.

In support of their theory that Huber's jumbo panels were in some respect defective and responsible for the wavy floors, Fairmont retained Dr. Brian K. Via, Ph.D. to examine Huber's jumbo panels. Dr. Via holds a B.S. in forest products and a M.S. in wood mechanics from Virginia Tech and a Ph.D. in wood spectroscopy and quality from Louisiana State University. Tr. 389. Dr. Via has been a professor of wood products and biocomposites at Auburn University since 2008, teaching topics including OSB, plywood, particle boards, and medium density fiberboard, among other things. Tr. 386. He spent three years at Louisiana Pacific Corporation as a quality control supervisor and new products developer. Tr. 391. Before that, Dr. Via worked for International Paper as a wood quality project leader. *Id.*

Dr. Via concluded that excessive linear expansion of the jumbo floor panels, attributed to moisture absorption, caused the wavy or warping of the floor panels. Specifically, Dr. Via tested four samples from Huber jumbo panels to determine the maximum linear expansion of the panels. Tr. 390, 396. His test consisted of slowly removing the moisture from the panels by baking them at a temperature of sixty degrees Celsius, then placing the panels in a chamber with a high relative humidity, eighty-six percent, so that the panels would absorb moisture until they

5

were saturated. Tr. 428-29. Dr. Via measured the dimensions of the samples at near-zero moisture content and at saturation in order to determine the amount of maximum linear expansion of the jumbo panels. *Id.* Dr. Via's test showed that the jumbo panels had a maximum linear expansion of about half an inch. Tr. 432. Dr. Via opined that the 1/8 inch gap recommended by Huber was inadequate, and that the jumbo panels required a gap of at least one half inch. Tr. 445. Dr. Via opined that the reason some panels expanded too much was because they came out of the oven too dry and were installed in a Fairmont home without ever having absorbed sufficient moisture to prevent excessive linear expansion. Tr. 521-22. The jumbo panels would then quickly begin to absorb moisture and expand beyond tolerances. Tr. 522. Based on his observations, Dr. Via expected about twenty-five percent of the panels to expand beyond tolerances. *Id.*

      **C.**      **The extent of Huber's testing**

Huber's wood expert, Dr. Thomas Cunningham, a PhD in wood engineering, confirmed that the jumbo panels had a maximum linear expansion of about half an inch. Tr. 568. However, Dr. Cunningham disagreed with Dr. Via's assessments because they were the result of extreme situations, near-zero moisture content and complete saturation, that were uncommon and unlikely conditions in actual applications. Tr. 571-72. Dr. Cunningham admitted that Huber did not perform linear expansion tests between 2005 and 2006. Tr. 612. Surprisingly, Huber did not test any of the panels from the affected homes for excessive moisture content, except to measure the width of the panels in four homes. Tr. 628-30. Another Huber employee, Kurt Koch, testified that Huber performed linear expansion tests on two production sample panels out of thousands produced every week. Tr. 657.

6

## IV. CONCLUSIONS OF LAW

The Court has jurisdiction in this case under 28 U.S.C. §§ 1332 and 1441 because the parties are diverse and the amount in controversy exceeds $75,000. Because this is a diversity case, the Court applies federal procedural rules and state substantive law. *Bourke v. Dun & Bradstreet Corp.*, 1159 F.3d 1032, 1036 (7th Cir. 1998) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)). The Court must also apply Indiana's choice-of-law rules. *In re Bridgestone/Firestone Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). Under Indiana choice-of-law rules, Indiana substantive law controls. *Bridgestone*, 288 F.3d at 1018.

### A. Warranty of Merchantability[3]

Under Indiana Code § 26-1-2-314(1), the warranty that goods shall be merchantable is implied in a contract for their seller if their seller is a merchant with respect to goods of that kind. For goods to be merchantable, they must at least be, among other things, fit for the ordinary purposes for which such goods are used. Ind. Code § 26-1-2-314(2)(c). "Under the warranty of merchantability, then, the seller warrants that the item sold is reasonably fit for the general purpose for which it was manufactured and distributed." *Woodruff v. Clark County Farm Bureau Coop. Ass'n*, 286 N.E.2d 188, 194 (Ind. Ct. App. 1972). "In addition to sellers who are merchants with respect to goods of the kind at issue, a consumer may sue a manufacturer for economic loss based on breach of the implied warranty of merchantability even if the consumer purchased the product from an intermediary distribution chain." *Irmscher Suppliers, Inc. v.*

---

[3]Fairmont also made a claim for breach of the implied warranty of fitness for a particular purpose. However, during the final oral argument in this matter, Fairmont stated that it had abandoned its claims under this theory. Even if it had not abandoned this theory, Fairmont failed to demonstrate that there was the necessary reliance on Huber's expertise in selecting Huber's jumbo panels to create the implied warranty of fitness for a particular purpose.

*Schuler*, 909 N.E. 2d 1040, 1048 (Ind. Ct. App. 2009) (internal quotation omitted). Thus, vertical privity is not required for a claim of breach of implied warranty of merchantability against a remote manufacturer. *Hyundai Motor America, Inc. v. Goodin*, 822, N.E.2d 947, 959 (Ind. 2005). The implied warranty of merchantability is imposed by operation of law for the protection of the buyer, and it must be liberally construed in favor of the buyer. *Woodruff*, 286 N.E.2d at 194.

To recover damages, Fairmont must prove all of the following by a preponderance of the evidence: (1) a warranty existed; (2) Defendants breached the warranty; and (3) the breach of the warranty was a responsible cause of Fairmont's loss. *See* Indiana Model Jury Instructions § 2503. Breach of warranty is a question of fact. *Thompson Farms, Inc. v. Corno Feed Prods., Div. of Nat'l Oats Co., Inc.*, 366 N.E.2d 3, 19 (Ind. Ct. App. 1977). Defendants admit that the warranty of merchantability existed in this transaction.

### 1.     Defendants breached the warranty of merchantability.

Under Indiana law, Fairmont need not establish the specific defect in the product, but may use circumstantial evidence to show that Defendants breached the warranty of merchantability. *AAA Exteriors, Inc. v. Don Mahurin Chevrolet & Oldsmobile, Inc.*, 429 N.E.2d 975, 978 (Ind. Ct. App. 1981). "[A] malfunction in itself, in the absence of abnormal use and reasonable secondary causes, may be sufficient evidence of a defect to make the existence of defect a question for the jury." *Id.* Expert testimony is not required to prove a defect if there is sufficient evidence within a lay person's understanding to constitute a basis for legal inference mere speculation. *Owens v. Ford Motor Co.*, 297 F.Supp.2d 1099, 1103 (S.D. Ind. 2003).

The Court, as trier of fact, finds that Fairmont has shown, by a preponderance of the evidence, that Huber jumbo panels were not fit for their ordinary purpose as subflooring panels

in modular homes because they expanded excessively. Although expert testimony is not required, Fairmont provided an expert, Dr. Via., whom the Court finds to be credible. He opined that Huber's jumbo panels expanded excessively. Dr. Via also stated that he would expect excessive expansion in about twenty-five percent of homes, which is the approximate frequency with which the defect occurred.

However, even if Dr. Via's testimony is disregarded, Fairmont has shown strong circumstantial evidence that Huber's jumbo panels were defective. As the evidence showed, the floors became wavy under a variety of circumstances, including in homes with floors with I-joists and those with open-web trusses, in homes with concrete foundations and those with crawl spaces, and in homes located in eleven different states delivered by at least sixty-five different carriers. However, the one common factor that all homes shared was Huber's jumbo floor panels. Furthermore, as noted previously, another modular home manufacturer, Commodore, also experienced wavy floors when using Huber's jumbo panels.

Huber argues that merely showing a malfunction is insufficient to show a defect in this case because of the existence of an abnormal use. The Court disagrees. Huber argues that Fairmont abnormally used the panels because it installed them without gaps between the panels in order to square the floors. The Court finds that this did not constitute an abnormal use because it was a common practice in the modular home industry to install flooring panels without gaps. Fairmont had engaged in that practice for several years in the construction of its modular homes without incident until 2005. Additionally, Fairmont's building methods were approved by an outside auditor, RADCO, which specifically approved of installing flooring panels without gaps. Because the practice of installing floor panels without gaps was so widely accepted in the industry, it can not be said that such a common construction practice and one specifically

9

approved by an outside firm can constitute an abnormal use.

## 2. Defendants' breach caused Fairmont's loss.

Huber also argues that Fairmont has failed to establish causation, that is that the wavy or warped floor panels were the result of defective floor panels as opposed to other possible causes, such as broken or misaligned joists, or other factors not attributable to the floor panels themselves. In particular, Huber notes that Fairmont installed strong backs to strengthen joists and floor trusses in nearly all of the repaired floors. However, the mere possibility of these secondary causes is not sufficient to convince the Court, as fact finder, that they were reasonable and probable causes.

Causation is a question of fact. *See Sizemore v. Templeton Oil Co., Inc.*, 724 N.E.2d 647, 650 (Ind. Ct. App. 2000). "For a cause in fact to be a legal cause, it must have been a substantial factor in bringing about the harm. While there may be other contributing causes and more than one factor operating, the trier of fact may determine that one cause predominates over another in bringing about the harm." *Thor Elec., Inc. v. Oberle & Assoc., Inc.*, 741 N.E.2d 373, 381 (Ind. Ct. App. 2000). A person's conduct is a legally responsible cause if (a) the property damage would not have occurred without the conduct, and (b) the property damage was a natural, probable, and foreseeable result of the conduct. *See* Indiana Model Civil Jury Instructions, § 2505.

The Court finds that the expanding panels are a responsible cause of the wavy floors experienced in Fairmont's modular homes. The Court, as finder of fact, has determined that, while there may have been other contributing factors in some of the homes that experienced wavy floors, Fairmont has established that expanding Huber jumbo panels predominated over these other causes. For example, Fairmont has shown that in order to prevent wavy floors, it

needed to employ a gap between the panels greater than the gap recommended by Huber. Also, Fairmont employed a kerf cut to repair bowed panels, and in some cases made kerf cuts before shipping the houses. Fairmont also showed that Huber's jumbo panels were responsible for Commodore's wavy floor problems. Finally, Fairmont's expert, Dr. Via, opined that Huber's jumbo panels were the cause of the wavy floors, and to prevent wavy floors, Fairmont would need to employ a gap four times larger than the gap recommended by Huber.

Although Huber contended that a variety of other causes were responsible for the wavy floor panels, Huber failed to demonstrate that any other potential cause was more responsible for the wavy floors than its panels. While Huber pointed to weak and broken joists and soggy crawl spaces in a limited number of homes, it was unable to produce sufficient evidence to persuade the Court that these causes were responsible for the wavy floors. In fact, apart from the six homes it inspected, Huber did not test the affected panels for excessive linear expansion. Huber also did not test Fairmont's floor system to show that the joists were in fact responsible for the wavy floors. The mere possibility of other secondary or intervening causes is not enough. Huber must show, and they did not, that the secondary or intervening cause predominates over others. *Thor Elec* at 381. As a result, the Court, finds that Huber caused Fairmont's loss.

That having been said, this Court can not conclude that Fairmont has proven causation with respect to each of the homes it seeks damages. The Court notes that with respect to eight homes where a gap had been used during construction, the floors still warped and the gap between the panels remained. This suggests that in these eight homes, excessive linear expansion may not have been the cause for the warping of the floors. In these eight cases, the Court is persuaded that other secondary or intervening causes did predominate. As a result, Fairmont has not shown causation and Huber is not liable for the damages of these eight homes.

11

B.     Damages

A plaintiff must prove his damages as an element of his claim. *Schroeder v. Barth, Inc.*, 969 F.2d 421, 424 (7th Cir. 1992). The usual measure for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount. Ind. Code. § 26-1-2-714(2). This method for calculating damages describes the usual, standard and reasonable method of ascertaining damages in the case of breach of warranty, but it is not intended as an exclusive measure. Comment to Ind. Code § 26-1-2-714(2). Three alternative methods for calculating damages are (1) the cost of repair; (2) the fair market value of the goods warranted less the salvage value of the goods; and (3) the fair market value of the goods as warranted at the time of acceptance less the fair market value of the goods received at the time of acceptance. *Schroeder*, 969 F.2d at 423-24; *Michiana Mack, Inc. v. Allendale Rural Fire Prot. Dist.*, 428 N.E.2d 1367, 1371 (Ind. Ct. App. 1981). Courts routinely use the cost of repair method to determine the applicable damages in a breach of warranty case. *See e.g. Schroeder*, 969 F.2d at 424; *Rheem Mfg. Co. v. Phelps Heating & Air Conditioning*, 746 N.E.2d 941, 955 (Ind. 2001); *Hahn v. Ford Motor Co.*, 434 N.E.2d 943, 955 (Ind. Ct. App. 1982).

Fairmont established at trial that it expended $688,352.50 in repairing homes with wavy floors. Fairmont's damages should be reduced for those eight homes where Fairmont failed to carry its burden. In these eight homes, Fairmont has not shown that the wavy floors were caused by excessive linear expansion and cannot recover for their repairs. As a result, Fairmont's damages are reduced by $38,242.40.

Also, at trial, Fairmont admitted that it performed many repairs not attributable to Huber

jumbo panels. Fairmont estimated that $21,000 of repairs was not attributable to the Defendants, and Fairmont's damages should be reduced accordingly. Therefore, Fairmont's actual damages are $629,110.10.

Additionally, under Indiana law, Fairmont is entitled to prejudgment interest. "The award of prejudgment interest is founded solely upon the theory that there has been a deprivation of the plaintiff's use of money or its equivalent and that unless the interest is added, the plaintiff cannot be fully compensated for the loss suffered." *Crawford County Community School Corp. v. Enlow*, 734 N.E.2d 685, 692 (Ind.Ct.App. 2000). The parties agree that if the Court concludes that Huber is liable for Fairmont's damages, an award of prejudgment interest at the rate of eight percent (8%) per annum until payment of judgment is appropriate. Ind. Code § 24-4.6-1-102.

For ease of calculation, the Court will start the accrual of prejudgment interest from the date when Fairmont filed its complaint, July 1, 2009 through the date of judgment, a period of two years. As a result, the Court finds that Fairmont is entitled to prejudgment interest of $104,603.92 in addition to the $629,110.10 in actual charges. Fairmont's total damages are $732,714.02.

## V.     CONCLUSION

Because Fairmont established that: (1) the implied warranty of merchantability existed, (2) Huber breached the warranty when Huber's jumbo panels expanded excessively and, (3) the breach was a responsible cause of Fairmont's loss, the Court finds in favor of Fairmont and against the Defendants. The clerk is instructed to enter judgment in favor of Fairmont in the amount of **$732,714.02**.

**SO ORDERED.**

Dated this 4th day of October, 2011.

s/Christopher A. Nuechterlein  
Christopher A. Nuechterlein  
United States Magistrate Judge